...Pointer... ...Dr. George Simkins for about 2 weeks in college ... ... Go ahead snipers wait two minutes for rebuff um, your honors, um, there are three, uh, three points I'd like to discuss, your honors, today uh, the first is, um, is whether the, uh, whether the, this court's holding such a point to the, uh, to the petitioner's hearing uh, before the, uh, before the immigration court, uh, qualifies a changed circumstance which would, uh, require, or, which would require this court to remand this case, um, to the asylum application and, uh, to have the, uh, the petitioner's name on the bar the second point, your honors, is, um, whether this court should revisit, um, determination of whether Christians in Indonesia qualify as a disfavored group, uh, for asylum and with only approval analysis and the third is whether, uh, uh, whether this court should also revisit whether there is a pattern of, pattern of practice of persecution of Christians when you say we should revisit, uh, I think that there's authority already that they are a disfavored group well, I, I would agree, well, um, are there, there are so, why, aren't you happy to hear that? well, I am happy to hear that, your honor if, if they are a disfavored group then, your honors, um, what I would say is that, uh, that the, both the immigration court and the, uh, um, BIA, uh, err in determining there's not substantial evidence of the client, uh, I'm sorry, of the petitioner's, uh, demonstrating, uh, individualized risk okay, what's the next point? pardon, your honor? what's the next point you want to make? well, that, that there's also a pattern of practice of, uh, of, well, I'm sorry, your honor within the second point is, is that the, uh, BIA and the immigration court, um, uh, missing, then misapplied the law it should have granted the individual, uh, if not asylum, at least withholding of removal or, or if it had determined there were changes of circumstance, could have and should have granted him asylum well, tell us exactly what happened to him that would constitute persecution well, your honor, uh, there were, there were three incidents which the individual indicated um, one, of course, when he was young, involved his, uh, involved his aunt his aunt married a, um, a Muslim who then converted to, converted to, uh, Christianity and then as a result of it, lost his job, um, uh but that's nothing that happened to him no, your honor, uh, what happened to him is wasn't he in a church that was attacked? he was in a church, in 1995, he was in a church with his uncle, uh, that church was stoned, um, that church was stoned and, uh, also the uncle's car was, was damaged as a result of the attack uh, in 1992, he also, uh, was, um, basically had an encounter with Muslims when he was wearing a, when he was outside wearing his, uh, wearing a leather cross and, uh, basically it was ripped off his neck and he was told not to wear it um, and so, of course, he, uh his neck? yes ripped it off his neck? yes so, your honor, these, these incidents, um, coupled with, uh, what's happened, what, what happened to his, uh, aunt uh, the, uh, the persecution she suffered, or, or the, she and her husband um, coupled with, uh, the, the many incidents of, uh, uh, actions against any number of Christians in Indonesia whether, whether, uh, it comes to church foreclosures, um, uh, petitioner provided, uh, ample evidence of activities that were taken against many Christians even in the, uh, even in the, the country court that was submitted, uh, there was also an indication that, uh there was also an admission that, that many churches had been, had been closed, um, in Indonesia um, this, uh, this court previously has, uh, in Avitoba, Iso versus INS, has said that past threats of violence, um, can establish, may establish individual risk even if they do not rise to the level of persecution, um, in addition, this court has also found that there's a persecution, uh, in, in, uh in, uh, Partuni versus INS, uh, 21 F3336, um, in that case, um, there was also a situation, uh, one, one of the incidents where Partuni's church was stoned now, of course, in that case it was stoned by soldiers, but, um, but, uh, nonetheless, still you had a situation where you have Muslim stoning churches churning, uh, stoning Christian churches. What's in the record about, uh, current, uh, circumstances? Does he have a, uh, reasonable fear now? What, what are the circumstances in Indonesia? Well, Your Honor, uh, um, well, Your Honor, based on, um, uh, Your Honor, we did submit, uh, some exhibits with a supplemental, with our supplemental, uh, uh, brief which were, uh, which were unfortunately stricken, um, in which we, uh, attempted to show, um, more recent events, uh, recent activities in Indonesia. Uh, um, since that, that time, of course, there, there have been more church foreclosures. Um, there have been situations, um, of course, I'm not sure if, uh, Your Honor's heard in other cases, but, um, situations where, uh, students have been beheaded, um, for simply being Christians. And what's happened to them? Uh, there were, uh, uh, perhaps a couple of years ago, there were, uh, three, uh, Christian students, uh, that were beheaded, um, simply for attending Christian school. Um, there have been, there have been schools that have been, uh, closed. Um, uh, in addition, I believe there, uh, and I, I don't have the document, but there, there, um, there have been, uh, teachers who have been, uh, imprisoned for simply, uh, simply being accused of teaching Christianity to Muslims. Um, or I guess, I guess arguing that they were proselytizing to, to Muslims. So, uh, the, the circumstances, um, and, and frankly, Your Honor, the circumstances now are that, uh, although there may be, um, there may be a response that, um, but the government does not, uh, actively take any action or does not do anything to, to harm Christians. Um, uh, basically for the individual in Indonesia, for the individual Christian, um, they cannot, uh, openly, they cannot openly show their faith, uh, if, if they, if, uh, they tend to, uh, they tend to stay away from, uh, going out as much as possible unless it's, unless it's something involving work or, uh, going to their church, uh, because they can be recognized easily as Christians, um, in actions, and there's never, uh, there is never any day where, where they can, uh, walk the streets and not worry about, uh, perhaps some Muslims, uh, attacking them if they show, if they show any, any way that they're Christian, if they do anything. Um, uh, activities that, uh, we take for granted here in the United States. That's not a good place to leave. Do you want to save for the time we have left? Yes, Your Honor. Thank you. May it please the Court, Kristen Edison on behalf of the Attorney General. First, I wanted to thank the Court for accommodating my schedule. I'd like to return to, um, the discussion about the disfavored group analysis and, um, just point out at first that petitioners are ethnically... It's hard, hard to hear you. I apologize, Your Honor. Um, returning to the disfavored group analysis, um, I just wanted to point out that petitioners are not ethnically Chinese. They are... These cases are rather interesting because we've had several cases involving Chinese Christians, and apparently the two before us today, uh, are not, uh, not Chinese. That's correct, Your Honor. So, um, SAIL then is distinguishable from this case. Um, in SAIL, the Court, of course, found that the... You're Chinese, and you're persecuted in Indonesia, and you're better off than a Christian who's Indonesian. Well, Your Honor, in SAIL, um, the Court pointed out that, um, the longstanding discrimination and harassment against Chinese Christians, um... Is the distinction on the ground in the real world that people who are not ethnically Chinese but who happen to be Christian are less visible in the sense of not distinguishable from anybody else on the street? So is that your argument? I think that's a fair characterization, Your Honor. So you're saying you don't think they're in any kind of a, uh, group that is, uh, should be protected? I don't think on this record, um, Your Honor, that... Well, I'm not asking about this. It's a more general question, which is whether they are in, uh, should be considered in a protected group. A disdained group, Your Honor? Mm-hmm. Well, just... I can only speak to the facts of this case, of course, Your Honor. And I don't think that the record supports that finding in this case. Um, the country conditions reports in this case are from 2002. Um, and they point out, both the, um, State Department report on country conditions and the religious freedom report, um, that, um, although there's widespread tension, um, any violent conflicts are localized. Um, both Christians and non-Christians are involved in the violence. It's not one-sided. Um, there are interfaith groups back in 2002 that were, um, were working and were promoted by the government. Um, the government brokered peace accords, and, um, consequently, the violence between ethnic groups, pardon me, between religious groups decreased. I think that that, um... I don't think Petitioner has pointed to any evidence in this record to, um, show that Christians in Indonesia should be considered a disdained group. Counsel, something about this case that disturbed me. The only reason that Mr. Pelley came into the attention of the government was that he complied with the request that he go in and register after 9-11. And, uh, to have that registration used as a mechanism to identify persons, uh, who were here illegally and should be deported, uh, seems unfair. Um, well, Your Honor, um, Mr. Pelley entered the United States in 1998, and, um... There was no doubt he entered the country illegally. Right. But he's acted like a very responsible person, had a job, went to church, uh, not involved in any illegal activity at all. And, uh, had he not been requested to come in and register, he probably would never have come to the attention of the authorities. That may be, Your Honor. Um, however, Mr. Pelley still was required to apply for asylum within a year of arriving in the United States or to establish an exception. Um, still he was required to do that if he intended to seek asylum. So even if his, uh, asylum application is untimely, which is what the holding was below, would he still have the opportunity for us to consider withholding of removal? Yes, Your Honor. Mm-hmm. And, um, the government contends that the record doesn't control the conclusion that Mr. Pelley is eligible for withholding of removal. Um, again, as, as Your Honor had pointed out, um, there's really one own, there's only one instance of past persecution that he claimed that involved him. That was when his cross necklace was, um, torn off his neck. Um, and the other two incidents, um, which happened years before and years later, um, didn't involve him, um, involved his family members. And, um, didn't happen to him. He could have, it could have happened to any bystander. Do you think that the fact of being required to come in and register is a changed circumstance, uh, which would, uh, excuse his late asylum application? Well. Have you thought about it that way? Well, Your Honor, if that was Mr. Pelley's position, he was required to, um, argue that before the agency, and he did not, um, the agency hasn't had a chance to consider, um, that claim. Well, the agency doesn't get a chance to, uh, hear a fair number of claims that perhaps it should have heard and perhaps should have been presented, uh, to it because of the way the system is run. And, um, uh, the way the system is overseen, I don't want to say any more because it would probably upset me. You know, um, there are really two prongs to this. If he's not been able to establish, uh, persecution, he can still establish, uh, reasonable fear. Now, I hadn't, uh, heard about the beheadings. When did these happen? I'd be a little frightened, I think, if, uh, some of my, uh, uh, Christian, uh, friends had gotten beheaded. I understand the question, Your Honor. Um, however, I, um, Petitioner's Counsel unfortunately didn't point to any record site to support that contention. Is that accurate, though? Your Honor, I don't. I looked through the record, and I, I, I didn't, I don't believe that the record supports that contention. Well, not the record, but as a matter of fact, did that happen? You know, we can possibly take judicial notice or we can send things back, but did it happen? Your Honor, I read the most recent, um, country conditions report and religious freedom report, and I don't believe that, uh, those incidents were, were reported in the report. I, I, I just wanted to, um, return to Your Honor's question about, um, persecution and, and point out that this Court has considered, um, a fair number of cases after sale, um, including Wackery and Halim, in which, in which the Court has considered similar claims by Indonesian, um, Christians who were also Chinese and found the incidents of persecution that were more severe and more numerous than those that, um, that Petitioner experienced did not constitute persecution. In Halim and Wackery, um, the Court found that the experiences of those petitioners... Well, let me ask you this. Don't we have in the administrative record, um, uh, Indonesian government is aware and possibly complicit in torture and inflicted on Christians by Muslims? Uh, that's at 180 of the record. Uh, religious violence and the lack of an effective government response to punish perpetrators and prevent further attacks continue to lead to allegations that officials are complicit in some of the violence, or at a minimum, allowed to, allow it to occur with impunity. 181, government failed to prevent activities that lasted. Jihad, a paramilitary group engaged in a crusade against Christians. Military commander ordered troops to destroy Christian separatist movement, urging his men to kill them all, if necessary, but failed to take action to force this paramilitary group out of the area. Active duty and retired military personnel participated in or stood by during torture executions of Christians who refused to convert. I've got a pretty big file here. I mean, look. Lots of stuff up there. I understand, Your Honor. I think the... On top of that, they have, uh, they're westernized. Now, the petitioner's sister is an American citizen, and she's filed an application for him. He has, what, he has a little girl who's an American. He was sent her back to Indonesia. She's a Christian. Huh? Well, Your Honor, first, I wanted to point out that... Is that what the United States of America is all about? The Statue of Liberty and all the rest of it? I understand, Your Honor, that this case definitely involves sympathetic facts. Well, I mean, has the present Attorney General looked this case over? Does he know about this? I'm happy to take that back to my supervisors, if Your Honor feels that's necessary. But I just wanted to point out... Show it to Mr. Osuna. Has he seen it? I'm happy to do that, Your Honor. Yeah. Okay. He's a good guy. I agree, Your Honor. I did want to point out, though, as I mentioned before, the reports show that the violence is not one-sided, that Muslims are also victims of violence. And the reports that I mentioned earlier also indicate that the government has made progress in addressing violence, a brokered peace accord. And in subsequent cases, such as Wolong II, this Court has held that the government has shown commitment to religious freedom. The Court has certainly addressed this. Well, who were they targeting when you had that big explosion that went off at a resort where I think the Australians and New Zealanders were there in large groups? A lot of them were killed, huh? Unfortunately, yes. I believe that my time has expired. I have sent any questions to the Court. Okay. Thanks. All right. I think we've had enough.  We understand the case. Okay. Thanks. I'll take up the next one. Now, who belonged to this holder? All right.
judges: Fletcher B. , Pregerson, Graber